# EXHIBIT A

**SPS**

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

Sharad Tak vs. Jitendra Vyas et al.

**CL-2021-0008009**

TO:     Jiten~~~ Ira Vyas
        ~~~38th Street N
        ~~~ngton VA 22207

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on June 2, 2021.

JOHN T. FREY, CLERK
By: _____
             Deputy Clerk

Plaintiff's Attorney:  Robert McFarland

**VIRGINIA:**

CIVIL INTAKE

2021 MAY 28  PM 12: 38

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

**SHARAD TAK,**
**derivatively on behalf of**
**TECHNOLOGY VENTURES, LLC,**

        **Plaintiff,**

**v.**

**JITENDRA VYAS**

  **SERVE:**    **5162 38th Street N.**
                   **Arlington, VA 22207**

**and**

**SUNDEEP DAMANI**

  **SERVE:**    **898 Centrillion Dr.**
                   **McLean, VA 22102**


            **Defendants,**

**and**


**TECHNOLOGY VENTURES, LLC,**

    **Nominal Defendant.**

**CASE NO:_____**

**2021   08009**


**JURY DEMANDED**

## DERIVATIVE COMPLAINT

Plaintiff Sharad Tak ("Plaintiff") files this Derivative Complaint on behalf of Technology Ventures, LLC ("Technology Ventures" or the "Company"), by and through his undersigned counsel, against Defendants Jitendra Vyas ("Vyas") and Sundeep Damani ("Damani") (collectively the "Defendants"), stating as follows:

**SUMMARY OF THIS ACTION**

1.     This derivative action addresses serious misconduct that has caused significant damage to the business operations of Technology Ventures.

2.     In 1999, Plaintiff and Defendants Vyas and Damani formed Technology Ventures, a Virginia limited liability company that places IT software consultants and provides related services. On or about the time of its formation, the Plaintiff and the Defendants entered into the Operating Agreement of Technology Ventures (hereinafter "the Operating Agreement"). The Operating Agreement sets forth the terms by which Technology Ventures is to function, and allocates the Parties' respective ownership interests. Since 2016, the Defendants have breached the Operating Agreement by making unilateral and impermissible decisions that benefited themselves to the detriment of Technology Ventures.

3.     Specifically, the Defendants breached the Operating Agreement by: (1) paying themselves unauthorized "consulting fees" in unreasonable amounts through Stream LLC and Foxhall Ventures (collectively, the "Defendants' Business Ventures"), for unspecified services without Board Approval, (2) failing to provide Board Members with advance notice of, or the opportunity to participate in, manager meetings and manager decisions, (3) withholding and/or failing to make proper distributions to all Board Members, consistent with each Member's ownership interest, and (4) using Company funds to invest in outside start-up business without obtaining the written consent of all Members.

4.     Because of the misconduct summarized above, Plaintiff brings this lawsuit on behalf of Technology Ventures seeking relief against Defendants for breach of contract and breach of fiduciary and statutory duties, as well as the issuance of a declaratory judgment and permanent injunction.

2

**PARTIES**

5.    Plaintiff is an individual who resides in the State of Florida. Plaintiff is the titular Chief Executive Officer and Chairman of the Board of Managers for Technology Ventures. Plaintiff is one of three member managers of Technology Ventures and has a 45.5% ownership interest in the Company.

6.    Defendant Vyas is a resident of the Commonwealth of Virginia. Vyas is the President of Technology Ventures. Vyas is the second of three member managers of Technology Ventures and has a 30% ownership interest in the Company. Vyas owns and operates Foxhall Ventures, LLC ("Foxhall"), which is/was a Virginia limited liability company.

7.    Defendant Damani is a resident of the Commonwealth of Virginia. Damani is the Chief Operating Officer for Technology Ventures. Damani is the third of three member managers of Technology Ventures and has a 24.5% ownership interest in the Company. Damani owns and operates Stream LLC ("Stream"), which is a Virginia limited liability company.

8.    The Nominal Defendant, Technology Ventures, is a limited liability company organized and existing under the laws of the Commonwealth of Virginia with its principal offices in McLean, Virginia.

## JURISDICTION AND VENUE

9.    Jurisdiction is proper in Virginia under Va. Code § 8.01-328.1 (a).

10.    Venue is proper in this Court under Va. Code § 8.01-262.

## THE DERIVATIVE NATURE OF THIS LAWSUIT

11.    This is a derivative suit brought on behalf of Technology Ventures pursuant to Va. Code §§ 13.1-1042 to 1045.

3

12. Plaintiff files this lawsuit after making specific demands to secure the commencement of this action. Specifically, Plaintiff made a demand for the Defendants to take immediate action to adhere to the provisions of the Operating Agreement and to remedy their respective breaches of fiduciary and contractual duties described herein. Such demands have been disregarded to date.

13. Plaintiff will adequately and fairly represent the interests of Technology Ventures and its Members in enforcing and prosecuting the Company's rights. Plaintiff was a Member of Technology Ventures at the time of the conduct complained of herein and he remains a Member. Therefore he fairly and adequately represents the interests of the Company and is a proper plaintiff pursuant to Va. Code § 13.1-1043.

## FACTUAL ALLEGATIONS

14. Plaintiff and Defendants created Technology Ventures and on March 1, 1999. Plaintiff and Defendants both signed the Operating Agreement. *See* **Exhibit 1**.

15. Technology Ventures is a Virginia limited liability company with a principal place of business in Virginia. It provides IT consulting and related services.

16. Since the Company's inception, Plaintiff and Defendants have served as the Company's sole Members and Managers, as defined by the Operating Agreement. *See* Ex. 1 §§ 3.1.1, 4.2.2(a). The rights and obligations of each Member and Manager are set forth in the Operating Agreement.

17. Plaintiff was named the Company's original Chairman of the Board of Managers and the Chief Executive Officer. *See* Ex. 1 §§ 4.2.3(b), 4.3.1(b). Plaintiff still holds those positions, in name.

4

18.     Pursuant to the Operating Agreement, management of the Company's day-to-day activities is supposed to be conducted by the Board of Managers by meeting and vote, weighted consistent with their respective ownership interest. *See* Ex. 1 § 4.2.4(a). Each Manager is entitled to advance notice of any meeting of the Board of Managers. *See* Ex. 1 § 4.2.4(c). Any management decisions made in absence of a meeting require each Manager receive notice of the decisions within ten (10) days of the decision. *See* Ex. 1 § 4.2.4(e).

19.     The Operating Agreement authorizes the Board of Managers to set salaries for Company officers. *See* Ex. 1 § 4.3.10.

20.     Similarly, for each fiscal year, the Board of Managers is to meet and determine net cash flow available for distribution to the Members. *See* Ex. 1 § 6.1. Distributions are to be paid pro rata, based on each Member's ownership interest. *See id.*

21.     Vyas and Damani both serve as Company officers. For some period of time the Defendants have also been heavily compensated as "consultants" for Technology Ventures through their respective limited liability companies. There are no written consulting agreements between Defendants and Technology Ventures setting forth the duties, obligations and other terms of this "consulting" arrangement.

22.     Over the past several years, the Defendants have violated the terms of the Operating Agreement by making decisions on behalf of the Company for their individual benefit, without proper notice to other Members and without other Members' knowledge, input and/or approval.

23.     In the last five years, the Defendants have provided notice of only two Board of Managers meetings, one in 2017 and one in 2020. No Board of Managers meetings were held in 2018 and 2019; the meeting in 2020 was only held because Plaintiff insisted on it.

5

Board of Managers meetings occurred, as is required by the Operating Agreement. Similarly, Defendants have failed to provide notice of decisions made in the absence of formal Board of Manager meetings, as is required by the Operating Agreement.

25. It is clear, however, that over the past several years, Defendants have made a number of decisions, ostensibly for the Company, without all Members' notice or knowledge, which benefitted them at Technology Ventures' expense.

26. The Defendants' unilateral decisions include paying themselves ever-increasing salaries—by and through their respectively owned entities, Foxhall Ventures, LLC (Vyas) and Stream LLC (Damani)—for unspecified work as "consultants" to the Company, in violation of the provisions of the Operating Agreement. *See* Exh. 1, §4.2.9.

27. In the past two (2) years, the Defendants paid themselves annual "consulting fees" of $750,000 each, an amount far in excess of the prevailing competitive rates for the Defendants' positions and undefined duties. As noted, neither the Defendants nor their Business Ventures have written consulting agreements with Technology Ventures that set forth their duties, obligations and compensation.

28. It further appears that in 2020, the Defendants paid their respective entities the entire annual consulting fee in the first 60–90 days of the calendar year, before whatever services were fully performed.

29. Specifically, without Board vote or Member agreement, within the last five years the Defendants have unilaterally paid themselves, through their Business Ventures, the following identical amounts:

2015 – $569,625 each;

6

2017 – $689,246 each;

2018- $750,000 each;

2019- $750,000 each; and

2020 - $750,000 each.

30.     Since the Company's inception, the Defendants have excluded other Members from meetings and discussions about Member distributions.

31.     To date, Plaintiff has received only two (2) annual distributions of $100,000.

32.     Moreover, the Defendants invested Company funds in two start-up businesses, Binary Fountain and iPlace, without the written consent of all Members.

## COUNT I: BREACH OF SECTION 4.2.4 OF THE OPERATING AGREEMENT

33.     The foregoing allegations are hereby adopted and incorporated, as if fully re-alleged herein.

34.     The Operating Agreement is a valid, binding, and enforceable contract between the parties, governed by Virginia law. *See* Ex. 1 § 1.3.

35.     Pursuant to Section 4.2.4 of the Operating Agreement, all Managers are entitled to advance notice of any meeting of the Board of Managers and the right to participate in those meetings.

36.     With the exception of two meetings in 2017 and 2020, the Defendants have failed to provide notice to all Members of the Board of Managers meetings they have held. As such, any meetings called and held by the Defendants, without Plaintiff's knowledge, were conducted in violation of the Operating Agreement; and any actions taken at those meetings are void.

7

37.     Although any decision required to be made at a Board of Managers meeting may be made in the absence of a formal meeting, under certain circumstance, each Member must be given written notice, within ten (10) days of any such decision pursuant to Section 4.2.4(e) of the Operating Agreement.

38.     The Defendants never provided timely written notice to all Members of any decisions they made in the absence of a formal meeting, in violation of the Operating Agreement.

39.     In addition, setting Company officer salaries is a decision within the sole authority of the Board of Managers. *See* Ex. 1 § 4.3.10. Accordingly, the Defendants' annual payments to their Business Ventures for consulting services constitute the payment of officer salaries, which require Board of Managers' approval.

40.     The Defendants' unilateral decision to pay themselves consulting fees, without Board approval and/or Member consent, violated the Operating Agreement. In paying themselves exorbitant annual fees—under the guise of "consulting fees" by and through their Business Ventures—the Defendants have limited, and often prevented, financial distributions to all Members.

41.     Furthermore, in violation of Section 4.2.6(a)(iv), the Defendants invested Company funds in two businesses, Binary Fountain and iPlace, without obtaining the written consent of all Members.

42.     Additionally, in violation of Section 4.2.6(a)(iv), the Defendants purportedly hired the Business Defendants to perform unspecified services for the Company without obtaining the written consent of all Members.

43.     Section 4.2.9 of the Operating Agreement provides that any transaction involving a person or entity with whom a Manager is affiliated must be approved by the Board of Managers,

8

and any contract with such person or entity shall not be in excess of prevailing competitive rates for similar transactions.

44.     The Defendants, without Board of Managers' approval, have retained their own entities as "consultants," and are paying them far in excess of prevailing competitive rates, in violation of Section 4.2.9 of the Operating Agreement.

45.     Moreover, in 2020, the Defendants' Business Ventures received their entire annual fees within the year's first ninety (90) calendar days, notwithstanding they had not yet earned all those fees, and the negative effects full payment inflicted on the Company's finances.

46.     As a result of the Defendants' breaches of Section 4 of the Operating Agreement, and diversion of Company funds, Technology Ventures has suffered significant injury in an amount not less than $3,000,000.

## COUNT II: BREACH OF SECTION 6.1 OF THE OPERATING AGREEMENT

47.     The foregoing allegations are hereby adopted and incorporated, as if fully re-alleged herein.

48.     The Operating Agreement is a valid, binding, and enforceable contract between the parties, governed by Virginia law. *See* Ex. 1 § 1.3.

49.     Pursuant to Section 6.1 of the Operating Agreement, the Board of Managers is to determine the amount to be reserved for Company operations and the amount to be distributed to the Members, for each fiscal year.

51. Further, the Defendants have paid Plaintiff nothing for distributions in only two of the last twenty years, in further violation of the Operating Agreement.

52. As a result of the Defendants' breaches of the Operating Agreement, and unauthorized payments to themselves, Technology Ventures has been harmed in an amount not less than $3,000,000.

## COUNT III: BREACH OF DUTIES OWED UNDER THE VIRGINIA LIMITED LIABILITY CORPORATIONS ACT

53. The foregoing allegations are hereby adopted and incorporated, as if fully re-alleged herein.

54. Under the Virginia Limited Liability Company Act and Virginia common law, Vyas, by virtue of this role as the President, and Damani, by virtue of this role as Chief Operating Officer, owed and owe Technology Venture several legal duties. These include a fiduciary duty, a duty of loyalty, and a duty to act according to their good-faith judgment about the best interests of Technology Ventures. *See* Va. Code § 13.1-1024.1.

55. Through the conduct described above, the Defendants have beached each of those duties.

56. Specifically, the Defendants have violated their duties owed to Technology Venture by using Company funds to pay themselves "consulting fees" in unreasonable amounts through their own Business Ventures without the approval of the Board, investing Company funds in two-start up businesses without the consent of all Members; and failing to provide all Members with notice and/or the opportunity to be heard at Board of Managers meetings.

57. As a result of the Defendants' breaches of their duties owed to the Company, Technology Ventures has been harmed in an amount not less than $3,000,000.

10

## COUNT IV: UNJUST ENRICHMENT

58.     The foregoing allegations are hereby adopted and incorporated, as if fully re-alleged herein.

59.     This Count is an action for unjust enrichment under the common law of the Commonwealth of Virginia.

60.     As a result of the Defendants' conduct described above, Vyas and Damani have appropriated substantial benefits to which they are not entitled, and Technology Ventures has suffered a corresponding detriment.

61.     The Defendants' taking and retention of those benefits without paying Technology Ventures for their value is inequitable.

62.     Therefore, Vyas and Damani have been unjustly enriched by their appropriation of benefit resulting from, among other things, the improper use of Company funds for their own benefit.

63.     To the extent that Technology Ventures does not have an adequate remedy at law, it will suffer irreparable harm if it is not awarded appropriate compensation to redress this unjust enrichment, in an amount not less than $3,000,000.

## COUNT V: DECLARATORY JUDGMENT & PERMANENT INJUNCTION

64.     The foregoing allegations are hereby adopted and incorporated, as if fully re-alleged herein.

65.     The Operating Agreement is a valid, binding, and enforceable contract between the parties, governed by Virginia law. *See* Ex. 1 § 1.3.

11

66. Technology Ventures has suffered substantial harm as a result of the Defendants' multiple breaches of the Operating Agreement and will continue to suffer harm from the Defendants' ongoing failures to comply with the terms of the Operating Agreement without injunctive relief.

67. The forgoing allegations reflect controversies over the rights and obligations of the Parties under the Operating Agreement.

68. These controversies are of sufficient immediacy to warrant the issuance of a declaratory judgment and permanent injunction, which will clarify and settle the legal issues between the parties, order the Defendants' to refund the unauthorized, excessive payments they received since 2016, and enjoin them from future violations of the Operating Agreement, including unauthorized payments to themselves and/or their entities.

69. There is no adequate remedy at law and the probability of success on the merits is high. The Defendants continue to violate with impunity the plain language of the Operating Agreement.

70. The balance of hardships also favors a grant of injunctive relief. On one hand, the Defendants' will suffer no additional injury from being required to release Company funds that they unlawfully received in violation of the Operating Agreement. On the other hand, if Defendants are permitted to use Company funds without Member approval, their conduct will interfere with Technology Ventures' ability to continue its business operations in an efficient manner.

WHEREFORE, Plaintiff Sharad Tak, derivatively on behalf of Technology Ventures, LLC, respectfully requests this Court enter judgment against Defendants in an amount of not less than $3,000,000 for damages sustained by Plaintiff as a result of the Defendants' breaches of the

12

Operating Agreement and their duties owed to Technology Ventures; grant Plaintiff declaratory and permanent injunctive relief in the form of an order requiring the Defendants' compliance with the Operating Agreement and the return of all unauthorized payments to their Business Ventures; and award Plaintiff his costs and attorneys' fees incurred herein on behalf of Technology Ventures, LLC.

Plaintiff demands trial by jury on all claims and counts for which jury trial is authorized.

Respectfully submitted,

SHARAD TAK, derivatively on behalf of
TECHNOLOGY VENTURES, LCC

By Counsel

Robert W. McFarland (VSB No. 24021)
Micaylee A. Noreen (VSB No. 92433)
MCGUIREWOODS LLP
101 West Main Street, Suite 9000
Norfolk, Virginia 23510
Telephone:  (757) 640-3700
Facsimile:  (757) 640-3701
rmcfarland@mcguirewoods.com
mnoreen@mcguirewoods.com

Counsel for Plaintiff Sharad Tak

# EXHIBIT 1

# OPERATING AGREEMENT
# OF
# TECHNOLOGY VENTURES, LLC

This Operating Agreement (this "Agreement") of **TECHNOLOGY VENTURES, LLC**, a Virginia limited liability company (the "Company"), is made as of the 1ᵗ day of March, 1999 ("Effective Date") by and between **SHARAD TAK**, a resident of the State of Maryland ("Tak"), **JITENDRA VYAS**, a resident of the State of D.C. ("Vyas"), and **SUNDEEP DAMANI**, a resident of the State of VA ("Damani").

## R E C I T A L S:

**WHEREAS**, Tak, Vyas, and Damani are the sole Members of the Company, and the Members wish to establish this Operating Agreement for the governance of the Company.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree to the following:

## SECTION 1
## FORMATION AND PURPOSE

**1.1**    <u>Formation.</u>

1.1.1    The Company was formed on the Effective Date pursuant to the Act.

1.1.2    Each Member confirms and agrees to his status as a Member and subscribes for the acquisition of the Membership Interest set forth for such member in <u>Exhibit A</u>, upon the terms and conditions set forth in this Agreement.

1.1.3    Each Member hereby executes and adopts this Agreement as the Operating Agreement of the Company, pursuant to the Act.

**1.2**    <u>Name.</u>

The name of the Company is "Technology Ventures, LLC". All Company business must be conducted in the name of the Company or such other names that comply with applicable law as the Managers may select from time to time. Title to all assets of the Company shall be taken and held only in the name of the Company.

**1.3**    <u>Governing Law.</u>

This Agreement and all issues regarding the rights and obligations of the Members, the construction, enforcement and interpretation hereof, and the formation, administration and termination of the Company shall be governed by the provisions of the Act and other applicable laws of the Commonwealth of Virginia, without reference to conflict of laws principles.

### 1.4    Purposes.

The Company has been formed for the purposes of transacting any and all lawful business for which limited liability companies may be organized under the Act.

### 1.5    Foreign Qualification Governmental Filings.

Prior to the Company's conducting business in any jurisdiction other than the Commonwealth of Virginia, the Managers shall cause the Company to comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction. The Managers shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming to this Agreement that are necessary or appropriate to qualify, or, as appropriate, to continue or terminate such qualification of, the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

### SECTION 2
### DEFINITIONS

### 2.1    Definitions.

2.1.1   "Act" means the Virginia Limited Liability Company Act, as amended from time to time.

2.1.2   "Board of Managers" shall have the meaning ascribed to it in Section 4.2 .

2.1.3

2.1.4   "Closing" shall have the meaning ascribed to it in Section 9.3.4.

2.1.5   "Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

2.1.6   "Company" means Technology Ventures, LLC.

2.1.7   "Debt Instrument" means a promissory note or installment contractual obligation.

2.1.8   "Involuntary Transfer" shall have the meaning ascribed to it in Section 9.3.3.

2.1.9   "Members" means those Persons identified on Exhibit A, as such exhibit may be amended from time to time.

2.1.10  "Membership Interest" shall have the meaning ascribed to it in Section 3.1.2.

2.1.11  "Net Cash Flow" shall have the meaning ascribed to it in Section 6.1.1.

2.1.12  "Net Contributions" shall mean the amount of any capital contributions made by a Member, reduced by the amount of any return of capital contribution distributions made pursuant to Section 6.2.1 or 6.2.2 below.

2.1.13  "Offer Notice" shall have the meaning ascribed to it in Section 9.3.1.

2.1.14  "Offered Interest" shall have the meaning ascribed to it in Sections 9.3.1 and 9.3.3.

2.1.15  "Offering Member" shall have the meaning ascribed to it in Section 9.3.1.

2.1.16  "Original Owner" shall have the meaning ascribed to it in the definition of the term "Change in Control".

2.1.17  "Original Owner's Family" shall mean: (i) a spouse or descendant of the Original Owner; (ii) a trust created by the Original Owner for the benefit of the Original Owner, the Original Owner's spouse and/or descendants; or (iii) a partnership, corporation, limited liability company or other entity comprised of the Original Owner, the Original Owner's spouse and/or descendants.

2.1.18  "Person" means an individual, corporation (stock or nonstock), unincorporated association (profit or nonprofit), business trust, estate, partnership, limited liability company, trust, or two or more persons having a joint or common economic interest.

2.1.19  "Qualified Appraiser" shall mean a professional appraiser or Certified Public Accountant who is qualified by experience and ability to appraise the Membership Interest.  In all cases where a Qualified Appraiser is required under this Agreement, such Qualified Appraiser shall be appointed by unanimous agreement of the Members, and the cost of such Qualified Appraiser shall be borne by the Company.  If the Members cannot agree, they each may appoint a Qualified Appraiser who shall together establish a value in a single written opinion agreed to by the appraisers, and, in such case, the cost of each Qualified Appraiser shall be borne by the party which appointed such Qualified Appraiser.

2.1.20  "Transfer" shall have the meaning ascribed to it in Section 9.2.1.

2.1.21  "Transferring Member" shall have the meaning ascribed to it in Section 9.3.3.

**2.2**  **Other Terms.**

Other terms used in this Agreement are defined in the context in which they are used and shall have the meanings there indicated.

### SECTION 3
### STATUS, RIGHTS AND OBLIGATIONS OF MEMBERS

**3.1**  **Members.**

3.1.1  Members.  The names of the Members of the Company and the notice address of each such Member are set forth on Exhibit A attached hereto.

3.1.2  Membership Interests.

The Members agree that each Member's percentage of ownership interest in the Company (hereinafter referred to as a "Membership Interest") shall be as set forth on Exhibit A, as may be amended from time to time pursuant to this Agreement. Membership Interests shall not be certificated.

3.1.3

**3.2    Actions by Members.**

(a)    Voting. Members shall vote in proportion to their respective Membership Interests. Unless otherwise set forth in this Agreement or by the Act, any action requiring a vote, consent or approval of a "majority of the Members" shall be authorized if more than fifty percent of the outstanding Membership Interests entitled to vote, vote for, consent to or approve of, such action. At any meeting of the Members, each outstanding Membership Interest that is entitled to be voted may be voted in person or by general or specific proxy or power of attorney directed to a Member present, or by specific instructions in writing. The record date fixed for determining the Members entitled to notice of or to vote at a Members' meeting shall be the date, not more than sixty (60) days before such meeting, fixed by the Board of Managers as the date on which the transfer books of the Company are to be closed or as the record date. Every proxy shall be in writing, dated and signed by the Member entitled to vote or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or any other officer or agent authorized to tabulate votes at the time of the meeting. No proxy shall be valid after eleven (11) months from its date, unless otherwise expressly provided in the proxy. A quorum for the transaction of any particular business at a meeting of the Members shall exist if Members holding the majority of the Membership Interests are present in person or represented by proxy, power of attorney or other written instruction.

3.2.2    Notice of Meetings. A meeting of the Members may be called by any Member. Written notice stating the place, day, and hour of every meeting of the Members shall be given not less than five (5) nor more than sixty (60) days before the date of the meeting to each Member entitled to vote at such meetings, at his address that appears on the records of the Company, except the notice of a Members' meeting to act on a plan of merger, a proposed sale of substantially all the assets of the Company, or the dissolution of the Company shall be given not less than fifteen (15) days nor more than sixty (60) days before the meeting date. Written notice is effective when received. Oral notice is effective when communicated if communicated in a comprehensible manner. Meetings may be held at any time without notice if all of the Members are present, or those not present waive notice as provided in Section 3.2.3 below.

3.2.3    Waiver of Notice. A Member may waive any notice required hereunder for a meeting before or after the date and time of such meeting that is the subject of such notice. The waiver shall be in writing, signed by the Member entitled to the notice, and shall be delivered to the secretary of the Company for inclusion in the minutes or filing with the Company's records. A Member's attendance at a meeting: (i) waives objection to lack of notice or defective notice of the meeting, unless the Member, at the beginning of the meeting, objects to holding the meeting or transacting business at the meeting; and (ii) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

3.2.4   <u>Action Without Meeting</u>.  Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is approved by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting.  Each such action without a meeting shall be evidenced by one or more written consents: (i) which will be filed with the Company's records; and (ii) a copy of which will be provided to all Members within ten (10) days after execution.  Such action shall be effective as of the date specified in the written consent(s).

**3.3**   <u>Restricted Activities</u>.

3.3.1   <u>Use of Company Information</u>.   Each Member covenants and agrees with the Company and the other Member that, except on behalf of the Company and as authorized by the Company, it will not use or permit others to use, disclose or divulge to others, copy or reproduce or remove from the custody and control of the Company any information relating to or used in the business and operations of the Company whether in written or unwritten form or in a form produced or stored by any magnetic, electrical or mechanical means or process, that is confidential information or trade secrets of the Company.

3.3.2   <u>Other Business Ventures</u>.  Each Member may engage in or possess any interest in any other business of any nature and description, independently or with others, and neither the Company nor the other Member shall have any rights in or to any such independent venture or the income or profits derived therefrom; provided, however, that no Member nor any affiliate thereof shall engage in or possess an interest in any business (other than the Company) that is engaged in providing services similar to those set forth in Section 4.1 within the United States without the unanimous written consent of the Members.

**3.4**   <u>No Preemptive Rights</u>.

No Member shall have any preemptive, preferential or other similar right with respect to (i) additional capital contributions or loans to the Company; or (ii) issuance or sale of any Membership Interests by the Company.

**3.5**   <u>Change In Control of a Member</u>.

If any Member is subject to a Change in Control, then such impending Change in Control shall be treated as an Involuntary Transfer pursuant to Section 9.3.2 below.

## SECTION 4
## MANAGEMENT OF THE COMPANY

**4.1**     Company Operations

The company will be engaged in the placement of software consultants and related activities.

All of the Members shall be responsible for daily operations.  However, Vyas and Damani, in conjunction with Tak, shall be in charge of the following:

4.1.1   Recruiting of professionals for placement.

4.1.2   Negotiating the compensation packages of such recruited professionals.

4.1.3   Placement of the recruited professionals.

4.1.4   Negotiating the placement fee for such professionals provided that such placement shall be no less than $30.00 per hour or no less than the amount the Company is determining is the "break even" point for any such professionals.

4.1.5   Providing all accounting procedures, including, but not limited to, invoicing, accounts receivable, accounts payable, and payroll.

4.1.6   Hiring and firing of employees.

4.1.7   Structuring joint ventures, strategic alliances or partnerships with other entities.

4.1.8   Instituting suits or actions in the name of the Company for amounts due or for any other cause of action which the Company may have.

4.1.9   Obtaining necessary additional funding.

**4.2**   Management by Board of Managers.

4.2.1   Power and Authority of the Board of Managers.  Except as otherwise expressly limited in this Agreement, the Board of Managers shall: (i) exercise complete and exclusive control of the management of the Company's business and affairs; and (ii) have the right, power, and authority on behalf of the Company, and in its name, to exercise all of the rights, powers, and authorities of the Company under the Act.  Each Manager shall discharge his or her duties as a manager in accordance with the standards of conduct set forth in the Act.

4.2.2   Number of Managers.  The initial Board of Managers shall consist of 3 Managers. The number of Managers may be increased or decreased from time to time, without amendment to this Agreement, by approval of a "majority of the Members" as defined in section 3.2 (a) above, provided that in no event shall there be more than one Manager per Member except upon the unanimous vote of the Members.

(a)     The Board of Managers.  The initial Board of Managers shall be Sharad Tak, Jitendra Vyas and Sundeep Damani.  Each Member owning Membership Interests equal to 5% or more of the Company may appoint a manager to the Board of Managers.  Each Manager shall serve on the Board of Managers at the pleasure of the Member that designated such Manager.

4.2.3   Chairman.

(a)     The Chairman of the Board of Managers shall be elected by the Board of Managers.  Should the Chairman resign or become unable to act as Chairman due to death or incapacity, the Board of Managers may elect any Manager to serve as Chairman.  The term of any chairman so elected shall be one (1) year.  The Chairman, if any, shall preside over all meetings of the Board of Managers and the Members; in his or her absence, or if no Chairman has been elected, the Board of Managers may designate another Manager to preside.

(b)     The initial Chairman of the Board of Managers shall be Sharad Tak.  Notwithstanding Section 4.2.4(a) above, Mr. Tak shall be entitled to remain as the Chairman of the Board of Managers until such time as Mr. Tak desires to resign from such position or he becomes unable to act as Chairman due to death or incapacity.

4.2.4   Meetings of Managers.

(a)     Each Manager shall have a vote equal to the Membership Interest of the Member or Members that selected such Manager and each matter to be decided by the Managers shall be decided by the affirmative vote of a majority of such Membership Interests. Any Manager not present at a meeting may vote on any matter by general or specific proxy or by power of attorney directed to a Manager present or by specific instructions in writing. A quorum for the transaction of any particular business at a meeting of Managers shall exist if Managers representing a majority of the outstanding Membership Interests then in office are present in person or represented by proxy, power of attorney, or other written instruction.

(b)     Meetings of the Board of Managers shall be called at places within or without the Commonwealth of Virginia and at times fixed by resolution of the Board or upon call of the Chairman or a majority of Managers.  Members of the Board of Managers may participate in a meeting of the Board, and the Board may conduct meetings through the use of, any means of communication whereby all persons participating in the meeting can simultaneously hear each other, and participation at such meetings shall constitute presence in person at such meeting. A written record shall be made of any action taken at a meeting conducted by such means of communication.

(c)     The Secretary or any Manager performing the Secretary's duties shall give not less than twenty-four (24) hours' notice in person or by letter or telephone, telegraph, teletype, or other form of wire or wireless communication of all meetings of the Board of Managers, provided that notice need not be given of regular meetings held at times and places fixed by resolution of the Board.  Oral notice is effective when communicated if communicated in a comprehensible manner.  Written notice is effective when received. Meetings may be held at any time without notice if all the Managers are present, or those not present waive notice as

provided in Section 4.2.5(d) below.  Notice of meetings of the Board of Managers need not state the purpose of the meeting.

(d)     A Manager may waive any notice required by this Agreement before or after the date and time stated in the notice, and such waiver shall be equivalent to the giving of such notice.  Except as provided in the next sentence, the waiver shall be in writing, signed by the Manager entitled to the notice, and filed with the Company records.  A Manager's attendance at or participation in a meeting waives any required notice to the Manager of the meeting unless the Manager at the beginning of the meeting or promptly upon his or her arrival objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or consent to action taken at the meeting.

(e)     Unless otherwise provided by law, any action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, which sets forth the action so taken, shall be signed by Managers representing a majority of the outstanding Membership Interests.  Each such action without a meeting shall be evidenced by one or more written consents: (i) which will be filed with the Company's records; and (ii) a copy of which will be provided to all Managers within ten (10) days after execution.  Such action shall be effective as of the date specified in the written consent(s).

(f)     A Manager who is present at a meeting of the Board of Managers at which an action is taken is deemed to have assented to the action taken unless (a) the Manager objects at the beginning of the meeting, or promptly upon his or her arrival, to holding it or transacting specified business at the meeting; or (b) the Manager votes against, or abstains from, the action taken.  The Secretary or any other officer performing the Secretary's duties shall maintain accurate records of all votes of the Board of Managers.

4.2.5   General Authority of Managers.

(a)     Except to the extent that the consent or approval of the Members (or Members holding a specified proportion of interests) is otherwise required by this Agreement or the Act, and subject to the conditions and limitations set forth elsewhere in this Article, the Managers shall have full, complete, and exclusive discretion to manage and control the business of the Company in furtherance of the purposes for which the Company is formed.  Each Manager shall exercise commercially reasonable efforts to promote and protect the interests of the Company and shall devote such time and attention as is reasonably necessary and appropriate to discharge such obligations.  A Manager shall not be liable to the Company or to the other Members for any errors or omissions committed in the discharge of his or her duties hereunder, unless such errors or omissions constitute gross mismanagement, gross negligence, willful or reckless misconduct, a knowing violation of criminal law, or intentional disregard of the express terms of this Agreement.

(b)     In furtherance and not in limitation of the foregoing grant of authority, the Managers are empowered on behalf of the Company to negotiate, execute, and deliver such agreements, instruments, deeds, certificates, and other documents as the Managers deem necessary and appropriate in the Managers' discretion to: (i) give effect to any leases, debt obligations and security therefor, joint ventures, or other cooperative understandings; or

(ii) procure labor, materials, or services, including without limitation the services of professionals.

(c)   All decisions made for and on behalf of the Company by the Managers shall be binding upon the Company. No person dealing with the Managers shall be required to determine the Managers' authority to enter into any undertaking on behalf of the Company, nor to determine any fact or circumstance bearing upon the existence of such authority; provided however, that nothing herein shall extinguish, limit, or condition the liability of the Managers to the other Members to discharge his or her obligations in accordance with this Agreement and the Act.

### 4.2.6   Limitations Upon Managers' Authority.

(a)   Without first obtaining the written consent of all of the Members, the Managers shall not:

(i)   Do any act in contravention of this Agreement;

(ii)   Do any act (other than a sale of all or any part of the assets of the Company) that would make it impossible to carry on the ordinary business of the Company;

(iii)   Confess a judgment against the Company;

(iv)   Possess or in any manner deal with the Company's assets or assign the Company's rights in any Company assets for other than Company purposes;

(v)   Admit a person as a Member of the Company other than in accordance with the terms of this Agreement; or

(vi)   Require any Member to contribute to the capital of the Company except as expressly provided in this Agreement.

(b)   The foregoing limitations are in addition to, and do not supersede any other limitations or prohibitions expressly imposed upon the Managers under this Agreement or by the Act.

### 4.2.7   Third Party Reliance.   Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managers as set forth in this Agreement. The signature of a Manager in accordance with this Agreement shall bind the Company and be sufficient for all purposes.

### 4.2.8   Reimbursement and Compensation.   All expenses incurred with respect to the organization, operation and management of the Company shall be borne by the Company. The Managers shall be entitled to reimbursement from the Company for direct expenses allocable to the organization, operation and management of the Company. Nothing herein shall preclude

Managers from serving the Company in other capacities and receiving compensation for such services.

4.2.9   Managers and Affiliates Dealing With the Company.  The Managers may appoint, employ, contract or otherwise deal with any Person, including Persons with whom a Manager is affiliated, and Persons in which a Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Managers may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

### 4.3   Officers.

4.3.1   Appointment.

(a)      The Managers may appoint the Chief Executive Officer, President, Chief Operating Officer, one or more Vice Presidents, a Secretary, a Treasurer, and such other officers as they shall deem necessary to perform the duties assigned to officers of the Company by the Board of Managers.  Any Manager may hold two or more offices.  The officers of the Company shall have such authority to perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.  The election of an officer shall not of itself create any contract rights in favor of the officer.  All officers shall hold office until their successors are elected unless sooner removed from office as provided in Section 4.3.2 below or there is a resignation.

(b)      Notwithstanding Section 4.3.1(a) above and Section 4.3.2 below: (i) the Company's initial Chief Executive Officer shall be Sharad Tak and (ii) the Company's initial President shall be Jitendra Vyas (iii) the Company's initial Chief Operating Officer will be Sundeep Damani

4.3.2   Removal of Officers; Vacancies.  Except as set forth in Section 4.3.1(b) above, any officer of the Company may be removed summarily with or without cause, at any time, by the Board of Managers.  Vacancies may be filled by the Board of Managers.

4.3.3   Duties of the Chief Executive Officer.  The Chief Executive Officer shall, subject to the control of the Board of Managers, have general and active supervision and management of the business of the Company.  The Chief Executive Officer may sign, on behalf of the corporation, any deeds, mortgages, bonds, contracts or other instruments which the Board of Managers has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Managers or by this Agreement to some other officer or agent of the Company, or shall be required by law to be otherwise signed or executed, and, in general, shall perform all duties incident to the office of Chief Executive Officer and such other duties as may be prescribed by the Board of Managers from time to time.

4.3.4   Duties of the President.  The President shall, subject to the control of the Board of Managers, have general and active supervision and management of the business of the Company. The President may sign, on behalf of the Company, any deeds, mortgages, bonds, contracts or other instruments which the board of directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Managers

or by this Agreement to some other officer or agent of the Company, or shall be required by law to be otherwise signed or executed, and, in general, shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Managers or Chief Executive Officer from time to time.

4.3.5   Duties of the Chief Operating Officer. The Chief Operating Officer shall, subject to the control of the Board of Managers, have direct and active supervision and management of the business of the Company. The Chief Operating Officer may sign, on behalf of the Company, any deeds, mortgages, bonds, contracts or other instruments which the board of directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Managers or by this Agreement to some other officer or agent of the Company, or shall be required by law to be otherwise signed or executed, and, in general, shall perform all duties incident to the office of Chief Operating Officer and such other duties as may be prescribed by the Board of Managers or Chief Executive Officer from time to time.

4.3.6   Duties of the Vice President. Each Vice President, if any, shall have such powers and duties as may from time to time be assigned to him by the Chief Executive Officer, President or the Board of Managers. Any Vice President may, when authorized by the Board of Managers, sign and execute in the name of the Company, deeds, mortgages, bonds, contracts, or other instruments, except for the signing and execution of such documents as shall be expressly delegated by the Board, chief Executive Officer or President to some other officer or agent of the Company, or as otherwise required by law.

4.3.7   Duties of the Treasurer. The Treasurer, if any, shall have charge of and be responsible for all funds, securities, receipts, and disbursements of the Company and shall deposit all monies and securities of the Company in such banks and depositories as shall be designated by the Board of Managers. The Treasurer shall be responsible: (i) for maintaining adequate financial accounts and records in accordance with generally accepted accounting practices; (ii) for the preparation of appropriate operating budgets and financial statements; (iii) for the preparation and filing of all tax returns, which are required by law; and (iv) for the performance of all duties incident to the office of Treasurer and such other duties as from time to time may be assigned to the Treasurer by the Board of Managers, Chief Executive Officer or the President. The Treasurer may sign and execute in the name of the Company deeds, mortgages, bonds, contracts, or other instruments, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Managers or by this Agreement to some other officer or agent of the Company or as otherwise required by law.

4.3.8   Duties of the Secretary. The Secretary shall act as secretary of all meetings of the Board of Managers and the Members of the Company. When requested, he or she shall also serve as secretary of the meetings of the Committees of the Board. The Secretary shall keep and preserve the minutes of all such meetings in permanent books. The Secretary: (i) shall see that all notices that are required to be given by the Company are duly given and served; (ii) shall have custody of all deeds, leases, contracts, and other important Company documents; (iii) shall have charge of the books, records, and papers of the Company relating to its organization and

management as a limited liability company; shall see that all reports, statements, and other documents required by law (except tax returns) are properly filed; (iv) shall maintain a record of the names and addresses of the Members of the Company and their successors in interest in the membership transfer book of the Company; and (v) shall in general perform all the duties incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the Board of Managers, Chief Executive Officer or the President.

4.3.9   <u>Assistant Secretaries and Assistant Treasurers</u>.  The Board of Managers may appoint one or more Assistant Secretaries or Assistant Treasurers, who shall perform such duties as shall be assigned to them by the Board of Managers or by such officers as shall be authorized by the Board of Managers to assign duties in respect thereto.

4.3.10  <u>Compensation</u>.  The Board of Managers shall have the authority to fix the compensation of all officers of the Company.

**SECTION 5**
**CAPITAL CONTRIBUTIONS AND**
**FINANCIAL OBLIGATIONS OF MEMBERS**

5.1   <u>Initial Capital Contributions</u>.

Mr. Tak will make an initial capital contribution  equal to $250,000, as and when required by the Company but no later than June 2001.  Mr. Vyas and Mr. Damani will not make any capital contributions.

5.2   <u>Additional Contributions</u>.

5.2.1   The Managers may arrange for the provision of such additional funds as are deemed necessary to conduct Company business.  Such additional funds may be raised by loans to the Company from outside sources, or by loans or capital contributions to the Company from one or more Members.

5.2.2   No Member shall be required to make any additional capital contributions to the Company, unless all the Members otherwise agree in writing.

5.3   <u>Guaranty of Company Indebtedness</u>.

A Member shall not be obligated to guarantee Company indebtedness or other contractual obligations unless it agrees in writing to do so.  However, with the unanimous consent of Members, a Member may guarantee any indebtedness of the Company for borrowed money.  If such Member is subsequently called upon by the creditor holding such debt to pay on the guarantee and does so, in whole or in part, such guaranteeing Member shall be entitled to indemnification from the other Members, pro rata in proportion to their respective Membership Interests, for the amount by which the amount the guaranteeing member actually pays exceeds the product of the guaranteed indebtedness and the percentage of its Membership Interest.

**5.4**     <u>No Interest Upon Capital Contributions</u>.

No Member shall be entitled to interest on its capital contributions.

**5.5**     <u>Return of Capital Contributions</u>.

No Member shall be entitled to withdraw any part of its capital contributions or its capital account or to receive any distribution from the Company, except as specifically provided in this Agreement. Except as otherwise provided herein, there shall be no obligation to return to any Member or withdrawn Member any part of such Member's capital contributions to the Company for so long as the Company continues in existence.

**5.6**     <u>Loans Not to be Treated as Capital Contributions</u>.

Loans or advances by any Member to the Company shall not be considered capital contributions and shall not increase the capital account balance of the lending or advancing Member.

**5.7**     <u>No Other Capital Contributions or Loans Required</u>.

Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the Company.

**5.8**     <u>No Third Party Beneficiaries</u>.

The provisions of this Agreement relating to the financial obligations of Members are not intended to be for the benefit of any creditor or other person (except Members) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and, except for Members, no creditor or other person shall obtain any right under any of such provisions or shall by reason of any of such provisions make any claim with respect to any debt, liability or obligation (or otherwise) against the Company or any of the Members.

### SECTION 6
### DISTRIBUTIONS OF CASH AND PROPERTY

**6.1**     <u>Distribution of Net Cash Flow</u>.

    6.1.1   <u>Net Cash Flow Defined</u>. The term "Net Cash Flow" for a fiscal year of the Company shall mean:

       (a)     All cash receipts as shown on the books of the Company (excluding, however, capital contributions from Members, net proceeds to the Company from the sale or the disposition of substantially all the Company's assets, condemnation proceeds, and excess title, property, casualty or liability insurance proceeds, if any, for the restoration or repair of the Company assets), reduced by cash disbursements for Company purposes including interest and principal upon loans, and all cash reserves set aside by the Managers that the Managers deem necessary to accomplish the Company business; plus

(b)     Any other funds, including amounts previously set aside as reserves by the Managers, deemed available by the Managers for distribution as net cash flow.

6.1.2   Priority of Distribution.   The Net Cash Flow of the Company for a fiscal year shall be paid out to the Members pro rata in accordance with their respective Membership Interests at such time as the Managers determine.

**6.2     Distribution of the Proceeds of Partial Sale or Refinance.**

6.2.1   Partial Sale.   In the event of a sale of a portion, but not all or substantially all, of the assets of the Company, the net proceeds of such sale shall be distributed in the following order of priority:

(a)     First, toward the satisfaction of all outstanding debts and other obligations of the Company then due, including Members who are creditors.

(b)     Then, pro rata in accordance with their respective Membership Interests, provided the pro rated membership proceeds, are at least enough to cover the initial capital contributions made to date (till the date of the sale/dissolution) by the individual members.

If the pro-rated membership proceeds are not enough to cover the initial capital contributions by any members, then such members will be paid first upto the full amount of their initial capital contribution invested till date of the sale/dissolution, and the remaining proceeds will be distributed pro-rata to the remaining members based on the proportionate membership interest of the remaining members.

6.2.2   Refinance.   In the event that the Board of Managers determines that all or any part of the proceeds of financing or refinancing secured by the assets of the Company are in excess of the needs of the Company, such excess proceeds shall be distributed to the Members, first, to repay their Net Contributions, then pro rata in accordance with their respective Membership Interests.

**6.3     Distribution of the Proceeds of Dissolution.**

If the Company dissolves, the net proceeds of dissolution, including any accompanying sale of Company assets, shall be distributed in the following order of priority:

(a)     First, toward the satisfaction of all outstanding debts and other obligations of the Company.

(b)     Then, pro rata in accordance with their respective Membership Interests, provided the pro rated membership proceeds, are at least enough to cover the initial capital contributions made to date (till the date of the sale/dissolution) by the individual members.

If the pro-rated membership proceeds are not enough to cover the initial capital contributions by any members, then such members will be paid first upto the full amount of their initial capital contribution invested till date of the sale/dissolution, and the remaining proceeds will be

distributed pro-rata to the remaining members based on the proportionate membership interest of the remaining members.

### 6.4  Distribution of Debt Instruments.

6.4.1  In the event the Company sells any of its assets and all or a portion of the sales price is paid by a Debt Instrument, all interest and principal received by the Company shall be treated as net proceeds of a sale or refinancing, or if such sale occurs in conjunction with the dissolution of the Company, as net proceeds of dissolution, and shall be distributed in accordance with Sections 6.2 and 6.3 above, as the case may be.

6.4.2  In the event the Company holds a Debt Instrument as described in Section 6.4.1 and the Company either is dissolved in conjunction with the sale that gave rise to such Debt Instrument or dissolves prior to payment in full of such Debt Instrument, the Managers shall assign such Debt Instrument to a trustee who shall collect all sums that may become due and payable under the Debt Instrument, who shall have the power and authority to act to enforce all rights of the holder of such Debt Instrument and who shall distribute such sums pursuant to the formula described in Sections 6.2 or 6.3, as applicable.

### 6.5  Distributions in Kind.

6.5.1  No Member shall be entitled to demand and receive distributions other than in cash form. Any noncash Company assets distributed in kind shall be distributed to the Members entitled thereto as tenants-in-common owning undivided interests in the same proportion as would be applicable to cash distributions.

6.5.2  If any Company assets are distributed in kind, such assets shall be distributed to the Members entitled thereto as tenants-in-common in the same proportion as the Members would have been entitled to cash distributions. The amount by which the fair market value of any property to be distributed in kind to the Members exceeds or is less than the tax basis of such property shall, to the extent not otherwise recognized by the Company, be taken into account for purposes of allocation of gain or loss and distributions of proceeds to the Members under this Section 6.

### SECTION 7
### FEDERAL AND STATE TAX MATTERS

### 7.1  Maintenance of Members' Capital Accounts.

With respect to each Member, a separate "capital account" for such Member shall be established and maintained throughout the full term of the Company in accordance with applicable Treasury Regulations that must be complied with in order for the allocations of taxable profits and losses provided in this Agreement to have "economic effect" under applicable Treasury Regulations.

7.2     Allocations of Profits and Losses of the Company.

Subject to Section 7.3 below, the Company's net income or loss for a fiscal year, computed in accordance with applicable federal income tax accounting principles, shall be allocated among the Members for each fiscal year as follows:

7.2.1   Net Loss.  The net loss (other than from a sale or disposition of all or substantially all of the Company's assets), if any, for a fiscal year of the Company shall be allocated to the Members in accordance with their respective Membership Interests.

7.2.2   Net Income.  The net income (other than from a sale or disposition of all or substantially all of the Company's assets), if any, for a fiscal year of the Company shall be allocated to the Members in accordance with their respective Membership Interests.

7.2.3   Net Loss from Sale of All or Substantially All of the Company Assets.  The net loss from a sale or other disposition of all or substantially all of the Company assets shall be allocated among the Members as follows:

(a)     To the members in accordance with their respective Membership Interests.

7.2.4   Net Income from Sale of All or Substantially All of the Company Assets.  The net income from a sale or other disposition of all or substantially all of the Company assets shall be allocated among the Members as follows:

(a)     To the members in accordance with their respective Membership Interests, provided the pro rated membership proceeds, are at least enough to cover the initial capital contributions made to date (till the date of the sale/dissolution) by the individual members.

If the pro-rated membership proceeds are not enough to cover the initial capital contributions by any members, then such members will be paid first upto the full amount of their initial capital contribution invested till date of the sale/dissolution, and the remaining proceeds will be distributed pro-rata to the remaining members based on the proportionate membership interest of the remaining members.

7.3     Special Tax Allocations.

Notwithstanding anything to the contrary contained above in Section 7.2:

7.3.1   The Company shall comply with Treasury Regulation Section 1.704-2 with respect to the allocation of deductions and minimum gain relating to nonrecourse debts of the Company.

7.3.2   No Member shall be allocated a net loss that would cause or increase a deficit balance in its capital account in excess of any obligation of such Member to restore deficits (as defined in Treasury Regulation Section 1.704-1(b)(2)(ii)(c)).  If any Member shall receive with

respect to the Company an adjustment, allocation or distribution in the nature described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4)-(6) that causes or increases a deficit in such Member's capital account, such Member shall be allocated items of income and gain in an amount and manner as will eliminate such deficit balance as quickly as possible. It is intended that this Section 7.3.2 shall constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3).

7.3.3   Any allocations required pursuant to Section 7.3.2 shall be taken into account in allocating net income and net loss pursuant to Section 7.2 above so that, to the extent possible, the net amount of such allocations shall be equal to the net amount that would have been allocated to each Member if the allocations pursuant to Section 7.3.2 had not occurred.

7.3.4   Any portion of any income, gain, loss or deduction with respect to property contributed to the Company by a Member shall be allocated among the Members in accordance with Code Section 704(c) and Treasury Regulation Section 1.704-3 so as to take account of the variation, if any, between the adjusted tax basis of such property to the Company and its fair market value at the time of the contributions.

7.3.5   In the event of the transfer of all or any part of a Membership Interest (in accordance with the provisions of this Agreement) at any time other than the end of a fiscal year, the share of income or loss (in respect of the Membership Interest so transferred) shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer. The provisions of this Section 7.3.5 shall not apply to any income or loss attributable to the sale or other disposition of all or substantially all of the Company assets, or to other extraordinary non-recurring items. Such income and loss shall be allocated to the owner of the Membership Interest as of the date of closing of the sale or other disposition, or, with respect to other extraordinary non-recurring items, the date the income is realized or the loss is incurred, as the case may be.

7.3.6   All interest expense of the Company with respect to amounts loaned to the Company by a Member or an affiliate of a Member shall be specifically allocated to such Member.

**7.4   Tax Year and Accounting Matters.**

The taxable year of the Company shall be the calendar year. The Company shall adopt such methods of accounting, and file its tax returns on the methods of accounting, as determined by the Managers upon the advice of the certified public accounting firm servicing the books and records of the Company.

**7.5   Tax Elections.**

The Tax Matters Partner, with the consent of the majority of the Members, may cause the Company to make or revoke all tax elections provided for under the Internal Revenue Code.

**7.6   Tax Matters Partner.**

Sharad Tak shall be the "Tax Matters Partner" for federal income tax purposes.

## SECTION 8
## TERM AND TERMINATION OF THE COMPANY

**8.1**     **Term of the Company.**

The term of the Company commenced upon the Effective Date, and shall continue until dissolved and terminated in accordance with this Agreement.

**8.2**     **Events of Termination.**

The Company shall be dissolved upon the occurrence of any of the following events:

     8.2.1    The determination in writing of a majority of the Members to dissolve and terminate the Company;

     8.2.2    The sale, transfer or assignment of substantially all the assets of the Company;

     8.2.3    Entry of a decree of judicial dissolution; or

     8.2.4    As otherwise required by Virginia law.

**8.3**     **Conclusion of Affairs.**

In the event of the dissolution of the Company for any reason, the Managers shall proceed promptly to wind up the affairs of and liquidate the Company. Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution. The Managers shall have reasonable discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market and general financial and economic conditions and consistent with their fiduciary obligations to the Members.

**8.4**     **Liquidating Distributions.**

After paying or providing for the payment of all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Managers to set up such reserves as they may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other assets of the Company shall be distributed to or for the benefit of the Members in accordance with this Agreement. The Managers shall have the right to distribute assets in kind, valued at the then estimated fair market value of such assets, as a liquidating distribution to the Members.

**8.5**     **Termination.**

Within a reasonable time following the completion of the liquidation of the Company, the Managers shall supply to each of the Members a statement that shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement. Upon completion of the liquidation of the

Company and the distribution of all Company assets, the Company shall terminate and the Managers shall have the authority to execute and file with the Secretary of State a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

## SECTION 9
### ADMISSION, TRANSFERS, ADDITION, SUBSTITUTION, AND WITHDRAWAL OF MEMBERS

9.1     **Admission.**

A new Member may be admitted to membership in the Company through the issuance by the Company of Membership Interest directly to such new Member by approval of a "majority of the Members" as defined in section 3.2 (a)

9.2     **Restrictions on Transfers.**

9.2.1   Except as provided in this Section 9, Membership Interests (including "economic interest") may be assigned, sold, gifted, pledged, encumbered, mortgaged or otherwise voluntarily or involuntarily transferred (a "Transfer") in whole or in part only upon a majority vote of the Members.

9.2.2   Unless waived by the Managers, a Membership Interest shall not be Transferred in the absence of an opinion of counsel, satisfactory to the Managers, that the registration of the Membership Interest is not required under the Securities Act of 1933 or any applicable state securities laws;

9.2.3   Absent the written consent provided in Section 9.2.1, or as otherwise permitted in this Section 9, any Transfer of a Membership Interest shall be effective only to give the transferee the right to receive the share of tax allocations and distributions to which the transferor would otherwise be entitled and the transferee shall have no right to exercise any of the powers, rights and privileges of a Member hereunder. A Member who has Transferred his Membership Interest shall cease to be a Member upon Transfer of the Member's entire Membership Interest and thereafter shall have no further powers, rights or privileges as a Member hereunder, but shall, unless otherwise relieved of such obligations by agreement of all the other Members or by operation of law, remain liable for all obligations and duties as a Member related to the time during which he was a Member;

9.2.4   The Company, each Member and any other person or persons having business with the Company need deal only with Members who are admitted as Members of the Company, and they shall not be required to deal with any other person by reason of a Transfer by a Member, except as otherwise provided in this Agreement. In the absence of the written consent provided in Section 9.2.1, or a transfer otherwise permitted by this Section 9, any payment to an assigning Member shall acquit the Company and the Managers of all liability to any other persons who may be interested in such payment by reason of a Transfer by such Member;

9.2.5   No person shall have a perfected lien or security interest in a Membership Interest unless the creation of such interest is in accord with the provisions of this Agreement and the

Company is notified of such interest and provided a copy of all documentation with respect thereto, including financing statements, prior to execution and filing; and

9.2.6   Any Transfer not in accord with this Agreement shall be void ab initio.

**9.3**   **Right of First Purchase and Involuntary Transfers of Membership Interests.**

9.3.1   If any Member (the "Offering Member") desires to voluntarily sell its Membership Interest, then the Offering Member may make such sale only after first offering its Membership Interest ("Offered Interest") to the other Members as provided below.  The Offering Member shall deliver to the other Members a written notice offering to sell the Offered Interest to the other Members at a price and pursuant to other terms as specified in the notice ("Offer Notice").  The other Members shall thereafter have a thirty (30) day exclusive option to purchase the Offered Interest as set forth in the Offer Notice, as the other Members may determine, in proportion to their respective Membership Interests unless they agree upon another proportion. The other Members shall exercise this option by sending the Offering Member written notice of the other Members' intent to purchase all of the Offered Interest.  If the other Members do not provide the Offering Member with written notice of the other Members' purchase of the entire Offered Interest within such option period, the Offering Member may sell the Offered Interest to any third-party during the ninety (90) days following the expiration of such option period, or such longer period as may be necessary to obtain any required third-party or governmental or regulatory consents or for the expiration of any required waiting periods; provided, however: (i) that the terms of such sale are no less favorable to the Offering Member than the terms set forth in the Offer Notice; and (ii) that each of the other Members shall be given, by the purchasing party, the option in writing, during the ninety (90) day period, to sell all of his or her Membership Interests to the purchasing party at the same time, at the same price and upon the same terms and conditions as the Offering Member (such option shall be conditioned upon the purchasing party purchasing the Membership Interests of the Offering Member).  In the event that such sale is not fully consummated within such ninety (90)period, the Offering Member must again comply with the provisions of this Section 9.3.1 before the Offering Member may sell the Offered Interest.

9.3.2   In the event that any Member (the "Transferring Member") becomes aware that such Member's Membership Interests may be involuntarily transferred to a third party (including, but not limited to through such Member's insolvency or bankruptcy, or due to a Change in Control) (an "Involuntary Transfer"), then the Transferring Member shall immediately provide the other Members with a written notice which describes such possible Involuntary Transfer and offer its Membership Interests to the other Members for purchase as provided herein ("Offered Interest").  The purchase price for the Offered Interest pursuant to this Section 9.3.3 shall be either (i) agreed upon by the Members or (ii) if the Members cannot agree, determined by a Qualified Appraiser.  Upon the determination of the purchase price for the Offered Interest, the other Members shall thereafter have a thirty (30) day exclusive option to purchase all or a portion of the Offered Interest, as the other Members may determine, in proportion to their respective Membership Interests unless they agree upon another proportion.

The other Members shall exercise this option by sending the Transferring Member written notice of the other Members' intent to purchase all or a portion of the Offered Interest.

9.3.3   For sales under this Section 9.3 and unless otherwise agreed by the parties, the "Closing" of the sale and purchase of Membership Interests shall take place at the principal offices of the Company within: (i) sixty (60) days after the receipt by the Offering Member of written notice exercising the other Members' option provided for in Section 9.3.1; or (ii) ninety (90) days after the receipt by the Transferring Member of written notice exercising the other Members' option provided for in Section 9.3.3, or such longer period as may be necessary to obtain any required third party or governmental or regulatory consents or for the expiration of any required waiting periods.

9.3.4   Unless otherwise set forth in the Offer Notice or agreed upon by the purchasing and selling Members, the purchase price for Membership Interests purchased pursuant to Sections 9.3.1 or 9.3.3 shall be paid in full at the Closing.  In the event that selling Member has any outstanding indebtedness due the Company and/or the purchasing Members or former Member, then any outstanding principal and interest thereon may, at a purchasing Member's option, be assumed by the purchasing Member as payment of the purchase price in part, or in whole, as the case may be.

## 9.4   No Right to Withdraw.

No Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the unanimous written consent of the remaining Members.

## 9.5   Effect of Withdrawal.

On and as of the effective date of a Member's withdrawal from the Company under the provisions of this Agreement, such former Member shall cease to have any Membership Interest or any management or other rights, status or privileges of a Member, but such former Member shall not be released or discharged from any of the obligations of a Member under the provisions of this Agreement, unless provided in the written consent of Members holding all of the outstanding Membership Interests entitled to be voted.

## SECTION 10
## ADMINISTRATIVE PROVISIONS

## 10.1   Principal Office.

10.1.1  The initial principal place of business and principal office of the Company shall be 1609 B South Hayes Street, Arlington, Virginia 22202.  The Company may relocate the principal office and principal place of business and have such additional offices as the Managers may deem advisable.

10.1.2  The Managers shall have the power, on behalf of the Company, to designate, where required, a registered agent (or other agent for receipt of service of process) in each state or other jurisdiction in which the Company transacts business and to designate, to the extent

required, an office, place of business or mailing address, within or without that state or other jurisdiction.

**10.2   Bank Accounts.**

10.2.1  Funds of the Company shall be deposited in an account or accounts of a type, in form and name and in a bank(s) or other financial institution(s) that are participants in federal insurance programs as selected by the Managers.  The Managers shall arrange for the appropriate conduct of such accounts.  Funds may be withdrawn from such accounts only for bona fide and legitimate Company purposes and may from time to time be invested in such short-term securities, money market funds, certificates of deposit or other liquid assets as the Managers deem appropriate.

10.2.2  The Members acknowledge that the Managers may maintain Company funds in accounts, money market funds, certificates of deposit, other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation or other depository insurance institutions and that the Managers shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution.

**10.3   Books and Records.**

At all times during the term of the Company, the Managers shall keep, or cause to be kept, full and faithful books of account, records and supporting documents, which shall reflect, completely, accurately and in reasonable detail, each transaction of the Company (including, without limitation, transactions with the Managers or affiliates).  The books of account shall be maintained and tax returns prepared and filed in the method of accounting determined by the Managers.  The books of account, records and all documents and other writings of the Company shall be kept and maintained at the principal office of the Company.  Each Member or his designated representative shall, upon reasonable notice to the Managers, have access to such financial books, records and documents during reasonable business hours and may inspect and make copies of any of them at his or her own expense.

The Managers shall cause the Company to keep at its principal office the following:

(a)     A current list of the full name and last known business address of each Member, in alphabetical order;

(b)     A copy of the Articles of Organization, and all Articles of Amendment thereto;

(c)     Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and

(d)     Copies of the Operating Agreement, as amended, and of any financial statements of the Company for the three (3) most recent years.

10.4    Notices.

Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively referred to as a "Notice"), shall be given by enclosing the same in an envelope addressed to the Member to whom the Notice is to be given at the appropriate address set forth on Exhibit A hereto or at such other address as any Member hereafter may designate to the others in accordance with the provisions of this Section 10.4, and deposited in the U.S. Mail postage prepaid, certified or registered mail, overnight courier or fax. The date at which Notice shall be deemed received shall be the date of the receipt of the copy of such Notice by the Member.

## SECTION 11
## INDEMNIFICATION AND LIMITATION OF LIABILITY

### 11.1    Indemnification of Members and Managers.

Except as provided in Section 11.3, every Person who was or is a party or who is threatened to be made a party to any pending, completed, or impending action, suit, or proceeding of any kind, whether civil, criminal, administrative, arbitrative, or investigative (whether or not by or in the right of the Company) by reason of: (i) being or having been a Manager or Member of the Company; (ii) being or having been a member, manager, partner, trustee, beneficiary, officer, or director of any other entity at the request of the Company; or (iii) serving or having served in a representative capacity for the Company in connection with any partnership, joint venture, committee, trust, employee benefit plan, or other enterprise, shall be indemnified by the Company against all expenses (including attorney fees), judgments, fines, penalties, awards, costs, amounts paid in settlement, and liabilities of all kinds, actually incurred by him or her incidental to or resulting from such action, suit, or proceeding to the fullest extent permitted under the Act, without limiting any other indemnification rights to which he or she otherwise may be entitled. The Company may, but shall not be required to, purchase insurance on behalf of such Person against liability asserted against or incurred by such Person in his or her capacity as a Manager or Member whether or not the Company would have authority to indemnify him or her against the same liability under the provisions of this Section 11.1 or the Act.

### 11.2    Liability Limitation.

Except as otherwise expressly provided in this Agreement, no Member or Manager shall have liability to the Company or other Members for monetary damages resulting from a single transaction, occurrence, or isolated course of conduct that does not constitute willful wrongdoing or intentional disregard of the terms of this Agreement, it being the intent and purpose of this Section that no Member or Manager have such liability for errors made in the exercise of good faith judgment and as a result of actions that such Member or Manager reasonably believed to be in, or not opposed to, the best interest of the Company.

### 11.3   Qualification of Indemnification and Liability Limitation.

The indemnification rights and limitations on liabilities set forth in Sections 11.1 and 11.2 shall not apply to claims based upon any willful misconduct, intentional breach or disregard of the terms of this Agreement, or knowing violation of criminal law or any federal or state securities law, including without limitation unlawful insider trading or market manipulation for any security, nor shall such indemnification rights and limitations on liabilities preclude the Company or any Member from recovery for any loss or damage otherwise covered under any insurance policy or fidelity bonding. Nothing herein shall be deemed to prohibit or limit the Company's right to pay, or obtain insurance covering, the costs (including attorney fees) to defend an indemnitee, Member, or Manager against any such claims, subject to a full reservation of rights to reimbursement in the event of a final adjudication adverse to such indemnitee, Member, or Manager.

### 11.4   Advances for Expenses.

Expenses (including attorney fees) incurred by or in respect of any such person in connection with any such action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, may be paid by the Company in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of such person to repay such amount, unless it shall ultimately be determined that he or she is entitled to be indemnified by the Company, in which case reimbursement shall not be required.

### 11.5   Elimination of Liability.

The Members acknowledge, agree, and desire that the liability of any Member or Manager to the Company or to any of the other Members shall be eliminated, to the maximum extent possible, pursuant to the Act. The provisions of this Article are in addition to, and not in substitution for, any other right to indemnity to which any person who is or may be indemnified by or pursuant to this Article may otherwise be entitled, and to the powers otherwise accorded by law to the Company to indemnify any such person and to purchase and maintain insurance on behalf of any such person against any liability asserted against or incurred by him or her in any capacity referred to in this Article or arising from his or her status as serving or having served in any such capacity (whether or not the Company would have the power to indemnify against such liability).

### 11.6   No Retroactive Effect of Amendment.

No amendment or repeal of this Article shall limit or eliminate the right to indemnification provided hereunder with respect to acts or omissions occurring before such amendment or repeal.

## SECTION 12
## MISCELLANEOUS PROVISIONS

### 12.1    Entire Agreement.

This Agreement, including the exhibits or other documents or schedules attached hereto or incorporated herein by reference, constitutes the entire agreement of the Members with respect to the matters covered herein.  This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

### 12.2    Amendment.

Except as provided by law or otherwise set forth herein, this Agreement may only be modified or amended by the unanimous written consent of Members; provided, however, that Exhibit A hereto shall be amended from time to time on the records of the Company by the Managers to the extent required to accurately reflect the then current status of the information contained thereon.

### 12.3    Interpretation.

Whenever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms.  The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

### 12.4    Severability.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to existing or future law, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the parties to this Agreement in accordance with applicable law.  The remainder of this Agreement shall remain in full force and effect.

### 12.5    Burden and Benefit Upon Successors.

Except as expressly otherwise provided herein, this Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns.

### 12.6    Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

12.7    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or original signature, each of which shall be an original, but all of which together shall constitute one instrument, binding upon all parties hereto, notwithstanding that all such parties may not have executed the same counterpart.

**IN WITNESS WHEREOF**, the parties have executed this Agreement to be effective as of the Effective Date.

MEMBERS:

**SHARAD TAK**

By: _____

Print: _____SHARAD TAK_____

Title: _____

**JITENDRA VYAS**

By: _____

Print: _____Jitendra Vyas_____

Title: _____

**SUNDEEP DAMANI**

By: _____Sundeep Damani_____

Print: ____SUNDEEP DAMANI____

Title: _____

## EXHIBIT A

| Name | Address | Membership Interest |
|---|---|---|
| | | |
| Sharad Tak | | 45.5% |
| Jitendra Vyas | | 30.0% |
| Sundeep Damani | | 24.5% |